MR. JUSTICE SHEEHY,
dissenting:
I dissent. The majority opinion goes far beyond the right of Joseph M. Belth from Indiana to gain access to IRIS reports. The majority in effect have told Montana citizens that they have no right to examine certain information in IRIS reports on hand in the office of the State Auditor and Insurance Commissioner about insurance companies with which Montanans do business. For that reason alone the majority opinion is inexcusable and indefensible.
*351 The majority opinion defies Article II, Section 9, Montana State Constitution (1972) which states:
“Right to know. No person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions, except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure.”
The question which we should be deciding in this case, and which is decided adversely by the foregoing majority opinion, is whether Montanans have a right to know that an insurance company doing business in this state has been identified as a “troubled company” by IRIS, and that such “troubled company” is being licensed or continues to be licensed by the state auditor. If the “right to know” provision of the state Constitution means anything, it means that this specific information should be available to Montana insureds and to any organization or entities that would funnel such information to Montana insureds.
In discussing this issue, I take as given that a corporation as well as a natural person can assert the right to privacy under the exception to the constitutional right to know because we said so in Mountain States Telephone and Telegraph Co. v. Department of Public Service Regulation (Mont. 1981), [_Mont._,] 634 P.2d 181, 38 St.Rep. 1479. I also accept as given what the District Court found, that Section 33-1-412(5), MCA, if otherwise valid, applies as well to investigation reports as to examination reports which are specifically covered under that section.
Unexplained and undiscussed by the majority is how public domain information, open to anyone, becomes private when it is run through a computer. Also unexplained and undiscussed by the majority is why or how Montanans should be precluded from information which would tell them how insurance companies licensed in this state stack up when compared with other insurance companies in the same business.
We are informed how the IRIS system works by the brief of amicus NAIC [National Association of Insurance Commissioners]. Its brief states:
“Once a year the NAIC disseminates statistical reports to each state insurance department. The reports set forth a usual range of ratio results based on previous studies. IRIS ratios are run on certain items taken from the annual statements such as surplus or premium and are compared to the usual range. If the results of the *352 testing produce values outside of the normal range, this indicates a need for further examination. The NAIC then prepares a list which highlights those companies reflecting values outside the normal range. At this point, insurance regulators take this information and combine it with their own internal methods of analyzing solvency. Internally, a department’s examiner will conduct a detailed analysis of all of the information which has been submitted. “The ratios discussed above are published and are available to the Respondent. The ratio results are actually compiled from annual statements, which statements are also available to the Respondent. The results are not produced from any secret source of material which state open records acts are designed to reveal. The ratio results, however, are confidential work product of the NAIC and are shared with its member regulators solely on the basis that the results are not to be divulged to the public.
“The analytical phase of the IRIS employs a team of examiners and financial analysts to review the ratio results. Companies selected for review are those which were designated with four or more ratios outside of the normal range, in addition to the companies targeted as requiring attention in the previous year. The overall objective of IRIS is to identify companies which appear to require immediate regulatory attention. (Emphasis supplied.)”
The majority opinion has erected a wall between Montanans and the information that regulators have determined some companies “appear to require immediate regulatory attention.” Such companies have been given an unwarranted right to privacy by the majority.
No types of corporations are so affected with the public interest as are financial institutions, which include insurance companies. It is because of this public interest that such corporations are so highly regulated by both state and federal authorities. Insurance companies, however, are not subject to federal regulation. Even though insurance companies are part of interstate commerce, United States v. South-Eastern Underwriters Association (1944), 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440, the Congress delegated to the states the duty of regulating insurance companies under the McCarran-Ferguson Act. 15 U.S.C. Sections 1011 through 1015. The principal regulators in each state have formed the National Association of Insurance Commissioners, with two ends in mind, one, to provide effective regulation of insurance companies, and at the same time to make the regulation as little onerous as possible. We are told that IRIS was *353 established in 1971 for the property and casualty industry as an aid to state regulators of companies engaged in such industry..
Because insurance companies are affected with the public interest, and because their activities are broadly regulated, the expectation of privacy of an insurance company does not begin to rise to the level of a mining company or retail store chain.
From the viewpoint of regulation, three kinds of insurance companies may be authorized to do business in this state: (1) domestic insurers, that is those domiciled or having their home office in this state; (2) foreign insurers, that is companies domiciled or having their home office outside of Montana but in one of the United States or its territories; and (3) alien insurers, that is insurance companies domiciled in a foreign country and represented in the United States by a manager (or in the case of Canada, an officer of the Canadian corporation). See Sections 33-2-111 and 33-2-215, MCA.
An insurance company, whether domestic, foreign, or alien, desiring to do insurance business in this state must obtain a certificate of authority from the commissioner who in this state is the state auditor. Section 33-2-101, MCA. Each authorized insurer may be examined as to its affairs, transactions, accounts, records and assets as often as the state auditor deems advisable but domestic insurers must be examined not less frequently than every three years. Section 33-1-401, MCA. All the other states have like provisions requiring examinations. Obviously if the separate examiners from the 50 states descended willy-nilly on insurance companies authorized to transact business in the respective states, the company business would be disrupted and the cost would be burdensome. To avoid this problem, the NAIC supervises examinations in an orderly manner in which the states participate on a regional basis and the examination results are made available to all the states in which the insurer is authorized. The examinations, as far as Montana is concerned, are at the expense of the insurer. Section 33-1-413, MCA.
The IRIS system conducted by the NAIC applies, as we have said, to the property and casualty business. The ratios which are used in IRIS are published, and are open to the public.
Each authorized insurer is required to file with the state auditor annually a statement of its financial condition, transactions and affairs as of the December 31 preceding. Section 33-2-701, MCA. Those statutory provisions which make the investigation and examination reports confidential do not apply to annual statements. Sec *354 tion 33-1-412(5), MCA. The material contained in the annual statement is open to the public.
Thus the basic information used by IRIS is public information. IRIS utilizes published ratios and applies those ratios to filed annual statements, to achieve results which IRIS now considers confidential. It is nonsense to hold that there is an expectation of privacy in the results so derived from public information. It approaches inanity to hold that Montana insureds shall not be allowed to know which troubled companies are doing business in Montana or that they are troubled companies. Such companies should have the least possible expectation of privacy.
The problem presented in this case has two phases which should be closely examined, 1), whether NAIC, by itself, can impose confidentiality so as to overrule our constitutional right to know and 2), whether the state auditor, under Section 33-1-412(5), MCA, may withhold from public inspection an investigation report obtained with tax monies, which report she uses in the regulation of insurers.
It should be clear that our constitutional provision for right-to-know does not depend on a classification of confidentiality by the NAIC. In San Gabriel Tribune v. Superior Court (1983), 143 Cal.App.3d 762, 192 Cal. Rptr. 415, it was held that assurances of confidentiality by the city to a disposal company that the data would remain private was not sufficient to convert what was a public record into a private record. If we countenance such assertion of confidentiality, the right to know provision will soon become worthless.
As to the second phase, District Judge Gordon Bennett concentrated on whether Section 33-1-412(5), MCA, was constitutional so as to empower the state auditor to withhold the information. The District Judge found that Section 33-1-412(5), was unconstitutional facially and as applied. His determination ought to be sustained by us.
The opening paragraph of District Judge Bennett’s discussion on right-to-know is worth repeating:
“An extraordinary theme ran through the proposal and consideration of three entirely novel sections of the 1972 Constitution. They were the ‘right of participation’ Section (8), sometimes called the ‘open meeting’ section; the ‘right to know’ Section (9), and the ‘right to privacy’ Section (10) all found in the ‘declaration of rights’ Article II. The theme was that except as it may be limited by the right of the individual to personal privacy, there is to be in Montana a *355 broad-based, pervasive and absolute right of citizens to know what is going on in their government and a right to participate in government untrammeled by the government itself.”
As District Judge Bennett indicated, in determining right to know, the three sections of Article II, Sections 8, 9, and 10 must be read together. Section 10 provides for a right of individual privacy (which we have determined applies to corporations) which shall not be infringed without the showing of a compelling state interest. Section 9 gives all persons a right to examine documents and to observe the deliberations of all public bodies or agencies of state government except where the demands of individual privacy clearly exceed the merits of public disclosure. Section 8 requires governmental agencies to afford a reasonable opportunity for citizens’ participation in the operation of agencies prior to the final decision “as may be provided by law.” It should be clear because the insurers are so affected with a public interest, because the affairs of their insureds are so dependent on insurers, and because property and casualty losses may affect third parties that there is a compelling state interest which overrides any right of individual privacy of an insurer to open up information that an insurance company doing business in this state is “troubled.” The state auditor and the NAIC contend that divulging such information may result in “a run on the company” but it may be more important to the insured to make that run before the company is found insolvent or its certificate of authority is jerked. Section 8 obviously intends that governmental agencies open up such information prior to the final decision of the regulators.
In the light of the three sections of Article II, District Judge Bennett determined that Section 33-1-412(5) was facially unconstitutional and invalid as applied. That particular statute was adopted in 1959, before the adoption of the state constitutional provisions in the convention of 1972. This is the first case in which the provisions of Section 33-1-412(5) have been examined in the light of those constitutional provisions. District Judge Bennett made an extensive review of the proceedings of the constitutional convention, and from it determined that an act of the legislature which in effect performs the balancing function between the right to know and the right of individual privacy was not within the grant of the, convention. He found it to be the prerogative of the courts, and not the legislature to define “parameters and incidents of the rights guaranteed by Sections 9 and 10.” He therefore held that while government agencies may be authorized by appropriate legislation to perform initially the *356 balancing act between the right to know and the right to privacy “it is the exclusive function of the state’s courts to make final determination as to which right is dominant in any given case.”
With a proper regard therefore to what the constitutional convention intended in adopting Sections 8, 9, and 10 of Article II, we should examine the reasons postulated by the NAIC and the state auditor for confidentiality in this case. What are those reasons?
First it is contended that insolvency of the insurer could result in a “run on the company” instigated by misinterpretation of IRIS data by those not trained to interpret the test results. That claim is pretty far-fetched. If insureds cancel their property and casualty policies, their premium refunds would be calculated on the short rate basis which would be adequately covered by the companies unearned premium reserves. Section 33-2-512, MCA.
Secondly we are told that those responsible for IRIS data collection fear they may be potentially liable for errors in reporting. If the IRIS data is that unreliable, perhaps the state auditor ought not to use the information in any event.
Third, we are told that if the Montana Insurance Department is required to disclose IRIS results, it will not be able thereafter to participate in the IRIS system which, it is contended, would have a devastating effect on the Department’s ability to monitor the solvency of its domestic as well as foreign companies. Montana has few if any domestic property and casualty insurers, and we doubt if the state auditor would be long in finding out, if it should occur, that a domestic insurer was in fact a “troubled company” under IRIS determinations. Other states would be monitoring foreign companies.
Finally, we are told that IRIS information is important to the state auditor in determining whether to authorize a foreign insurance company to do business in Montana. Again, astute questioning by the state auditor of an applicant for a certificate of authority would quickly determine its IRIS standing.
None of these contended reasons for withholding information contained in IRIS by the state auditor overweigh the right of our citizens to participate in the debate before their governmental bodies before the final decision, and to have access to information which is in the hands of public officials. Therefore I would sustain the District Court.